IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In Re:

JPK NEWCO, LLC,

    *Debtor.*

Case No.:  25-00200-ELG
Chapter 11

## DEVELOPER RE1, LLC'S AND 423 KENNEDY ST. HOLDINGS, LLC'S MOTION TO DISMISS CHAPTER 11 PETITION FILED IN BAD FAITH

Developer RE1, LLC ("RE1") and 423 Kennedy St Holdings, LLC ("423 Kennedy")

(collectively the "Borrowers"), each a party-in-interest in this case, by counsel, move this Court

to dismiss the Chapter 11 bankruptcy petition filed by JPK NewCo, LLC ("JPK NewCo") for

cause under 11 U.S.C. § 1112(b).  The Borrowers have included the accompanying Table of

Contents, Table of Authorities, and Memorandum in support.

James D. Sadowski, Esq.
D.C. Bar #446635
Greenstein Delorme & Luchs, P.C.
801 17th Street, N.W., Suite 1000
Washington, D.C.  20006
Phone:  (202) 452-1400
Email: jds@gdllaw.com
*Counsel for Developer RE1, LLC and*
*423 Kennedy St Holdings, LLC*

8161\0002\4934-0098-3376.v1

## TABLE OF CONTENTS

Memorandum in Support of Developer RE1, LLC's and 423 Kennedy St. Holdings, LLC's Motion to Dismiss Chapter 11 Petition Filed in Bad Faith .............................. 1

A.    Executive Summary ..................................................................................................... 1

B.    Jurisdiction and Venue................................................................................................. 2

C.    Preliminary Matters...................................................................................................... 2

D.    Detailed Factual Background About the Borrowers, the Loan Documents, and the D.C. Superior Court Cases ........................................................................................... 3

E.    Factual Background Regarding *JPK NewCo I* and the Formation of JPK NewCo. ........... 17

F.    The Legal Standards for Dismissing A Petition That Was Filed In Bad Faith ................... 25

   1.    The Prior Decisions From this Court. ............................................................. 26

   2.    The Second Circuit Test Used for Bad Faith................................................... 27

   3.    The Third Circuit Test Used for Bad Faith...................................................... 27

   4.    The Fourth Circuit Test Used for Bad Faith.................................................... 28

   5.    The Fifth Circuit Test Used for Bad Faith....................................................... 29

   6.    The Eleventh Circuit "Any Factors" Test Used for Bad Faith. ....................... 29

   7.    Additional Cases Addressing Bad Faith.......................................................... 30

G.    Legal Argument........................................................................................................... 31

H.    Conclusion................................................................................................................... 34

## TABLE OF AUTHORITIES

<u>Cases</u>

*American United Mut. Life Ins. Co. v. City of Avon Park*, 311 U.S. 138 (1940)........................ 31

*Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989) ................................................. 29

*Corto v. National Scenery Studios,* 705 A.2d 615 (D.C. 1997) ..................................... 32

*Franklin Mortg. & Inv. Co.,* 143 B.R. 295 (Bankr. D.D.C. 1992) ............................... 27

*In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir.) ....................................... 31

*In re Blue Chip Cap., DC, LLC,* 600 B.R. 735 (Bankr. D.D.C. 2019) ......................... 28

*In Re C-TC 9th Ave. P'ship*, 113 F.3d 1304 (2d Cir. 1997)......................................... 28

*In re Dunes Hotel Assocs.*, 188 B.R. 162 (Bankr. D.S.C. 1995) ................................. 30

*In re Forever Green Ath. Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015) ........................... 29

*In re G–2 Realty Trust*, 6 B.R. 549 (Bankr. D. Mass. 1980) ....................................... 35

*In re Griffieth*, 209 B.R. 823 (N.D.N.Y. 1996) ......................................................... 32

*In re Hammonds*, 139 B.R. 535 (Bankr. D. Col. 1992) ............................................. 32

*In re Lilley*, 91 F.3d 491 (3d Cir. 1996)..................................................................... 29

*In re LTL Mgt., LLC*, 64 F.4th 84 (3d Cir. 2023).......................................................... 29

*In re Meltzer*, 516 B.R. 504 (Bankr. N.D. Ill. 2014)................................................... 34

*In re Natural Land Corp.,* 825 F.2d 296 (11th Cir. 1987).......................................... 30

*In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393 (11th Cir. 1988) ................................. 31

*In re Sawyer*, No. 07-10252 SSM, 2007 WL 1275627............................................... 27

*In re Serfass,* 325 B.R. 901 (Bankr. M.D. Fla. 2005) ................................................. 35

*In re Silberkraus*, 253 B.R. 890  (C.D. Cal. Bankr. Ct. 2000)..................................... 34

*In Re Spagnolia,* 199 B.R. 362 (Bankr. W.D. Ky. 1995) ............................................ 32

*In re Winshall Settlor's Trust*, 758 F.2d 1136 (6th Cir. 1985) ................................... 30

*Industrial Insurance Services, Inc. v. Zick (In re Zick),* 931 F.2d 1124 (6th Cir. 1991) ............. 32

*Kramer v. Caribbean Mills, Inc.,* 394 U.S. 823 (1969) ............................................. 32

*Little Creek Development Co.,* 779 F.2d 1068, 1073 (5th Cir. 1986)......................... 28

*McDow v. Smith*, 295 B.R.69, 79-81 n. 22 (Bankr. E.D. Va. 2003)........................... 31

*Pleasant Pointe Apartments, Ltd. v. Kentucky Hous. Corp.,* 139 B.R. 828 (W.D. Ky. 1992) ..... 29

*SEC v. United States Realty & Improvement Co.*, 310 U.S. 434 (1940) ..................... 31

*U.S.I. Props. Corp. v. M.D. Constr. Co.,* 860 F.2d 1 (1st Cir. 1988) ........................... 33

*Wisconsin Ave. Assocs., Inc. v. 2720 Wisconsin Ave. Coop.*, 441 A.2d 956  (D.C. 1982) .......... 32

Statutes

11 U.S.C. § 1112(b)(1) ................................................................................................ 27

28 U.S.C. § 1359 ........................................................................................................... 32

Treatises

2 L. King, *Collier on Bankruptcy* § 301.05[1] (15th ed. 1979) ..................................... 30

2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| In Re:<br><br>JPK NEWCO, LLC,<br><br>   *Debtor*. | Case No.: 25-00200-ELG<br>Chapter 11 |

## MEMORANDUM IN SUPPORT OF
## DEVELOPER RE1, LLC'S AND 423 KENNEDY ST HOLDINGS, LLC'S MOTION TO DISMISS CHAPTER 11 PETITION FILED IN BAD FAITH

### A.  EXECUTIVE SUMMARY

The Chapter 11 petition was filed by JPK NewCo for the improper purposes of delaying civil litigation pending in the D.C. Superior filed by the Borrowers against JPK NewCo's two owners and its related company and individuals:  the WCP Fund I, LLC ("WCP Fund"), DP Capital , LLC d/b/a Washington Capital Partners ("WCP"), Daniel Huertas, Russell Drazin, and SF NU LLC ("SF NU") (the "Lender Defendants").  The Lender Defendants have colluded to manufacture federal jurisdiction to try to have this Court revisit and reverse prior decisions that did not favor them in two consolidated D.C. Superior Court cases.  Mr. Huertas controls the WCP Fund and the WCP.  The WCP Fund and SF NU are the co-owners of JPK NewCo.  JPK New Co's formation, the first involuntary petition by JPK New Co that was later dismissed (24-000262-ELG) ("*JPK NewCo I*"), and this second bankruptcy case are all part or an improper scheme to create federal jurisdiction so that the Borrowers' state law claims are adjudicated in this Court.  All available evidence to date shows that the scheme to create federal jurisdiction was recommended to the Lender Defendants by proposed special counsel for JPK NewCo, Maurice VerStandig.  JPK NewCo is not now, and never has been, a legitimate business that needs bankruptcy protection.  As a result, the Court should dismiss this case for cause.

1

## B.   JURISDICTION AND VENUE

1.      The Court has authority to hear and decide this matter under 28 U.S.C. §§ 157 and 1334.

2.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue of these proceedings and over this motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The Borrowers are parties-in-interest that have standing to seek dismissal of this case.  The Borrowers have been listed as creditors of JPK NewCo with "Disputed Unliquidated Contingent" claims.  ECF # 1 at 6.

## C.   PRELIMINARY MATTERS

4.      For many of the background facts about JPK NewCo, the Borrowers rely in large part, but not entirely, upon the facts set forth in The United States Trustee's Motion to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. § 1112(b) filed on September 23, 2024 in *JPK NewCo I*. ECF # 37 in *JPK NewCo I*.

5.      The Borrowers, just like the U.S. Trustee's office in *JPK NewCo I*, have not had any opportunity to take discovery in this case.  The Borrowers also do not have copies of documents that JPK NewCo provided to the U.S. Trustee's office as part of the initial debtor interview in *JPK NewCo I*, which documents informed the U.S. Trustee's office about seeking a dismissal of *JPK NewCo I*.  For those reasons, and because JPK NewCo will almost certainly be contesting this motion, the Borrowers will be serving written discovery requests under Rule 9014 and seeking a scheduling order to allow for the taking of depositions, to set other discovery deadlines, and to schedule an evidentiary hearing.

2

### D. DETAILED FACTUAL BACKGROUND ABOUT THE BORROWERS, THE LOAN DOCUMENTS, AND THE D.C. SUPERIOR COURT CASES

6.     Although the Court has some familiarity with JPK NewCo and a prior motion to dismiss that was filed that included serious allegations of bad faith by JPK NewCo., the Borrowers are including a comprehensive summary of the D.C. Superior Cases, what happened to those cases after removal and a recent remand decision, and the prior dismissed case involving JPK NewCo, so that there is a comprehensive record of that history in this case.

RE1 and 423 Kennedy.

7.     The Borrowers are sole-purpose limited liability companies that were formed to develop different real estate projects in the District.

8.     RE1, which is partially owned by Mel Negussie, is the record owner of real property in the District known as 5501 1st Street, N.W., Lot 138, Square 3389 (the "RE1 Property").

9.     423 Kennedy, which is co-owned by two members -- Mel Negussie (a 50% owner) and the Brighton KSDC, LLC ("Brighton Group") (the other 50% owner), is the record owner of real property in the District known as 423 Kennedy Street, N.W., Lot 56, Square 3260 (the "423 Property").

10.     The Brighton Group is comprised of forty-one individual investors, many of whom used their personal retirement savings to invest in the Brighton Group's membership interest in 423 Kennedy.

The Loan Documents.

11.     On December 23, 2021, the WCP helped facilitate RE1 obtaining an acquisition finance loan for the RE1 Property with the WPC Fund.

12.     On January 31, 2020, the WCP helped facilitate 423 Kennedy obtaining a construction finance loan for the 423 Property with the WCP Fund.  Due to unforeseen complications with the soil and water at the 423 Property, 423 Kennedy increased the original loan amount and refinanced the original construction finance loan on March 31, 2022.

13.     As part of the 423 Kennedy refinancing, the WCP and the WCP Fund agreed that they would provide construction draws to 423 Kennedy (up to $4,650,000.00) as construction on the project progressed.

14.     The loans to RE1 and 423 Kennedy were secured by a first and second promissory note and a first and second deed of trust recorded against the respective properties. The WCP Fund later assigned one or more of the deeds of trust to SF NU.

<u>RE1 and 423 Kennedy Begin the Process to Refinance Their Loans</u>

15.     In September of 2022, RE1 and 423 Kennedy began the process of refinancing their loans.  By early November of 2022, the Borrowers were well into the process of refinancing their loans with Main Street Bank, and those refinancings would have resulted in the WCP Fund being paid in full for both projects.

16.     As part of the refinancing process, in October of 2022 the WCP sent multiple payoff statements to 423 Kennedy.  None of those payoff statements alleged that 423 Kennedy was in default, nor did any of those payoff statements list any late charges or default charges.

17.     By November 3, 2022, the Borrowers had made all payments due under the loan documents and the WCP's own records evidenced that fact.  Up to that time, there was no claim made by anyone that any of the loan documents were in default.

<u>The Lender Defendants Starve 423 Kennedy of Construction Draw Funds.</u>

18.     By October 6, 2022, even though 423 Kennedy had paid all amounts due to the WCP Fund under the notes, the relationship between 423 Kennedy and the WCP started to sour

4

when Mr. Huertas informed Mr. Negussie that the WCP would stop funding construction draws to 423 Kennedy.

> **The WCP/WCP Fund Send Multiple Payoff Statements Without Making Any Claim of "Default" Under Any of the Loan Documents.**

19.     Around October 24, 2022, the WCP sent Payoff Statements listing the amounts needed to pay the balances owed under the 423 Kennedy loans.  Those statements did not include any charges for "Default Interest" or "Default Penalties".  By that date both Borrowers had made all payments to the WCP Fund that were due under the loan documents, and at that time there again was no allegation that any default existed under any of the loan documents.

20.     On November 3, 2022, Mr. Huertas emailed 423 Kennedy to inquire about the status of the payoff of the loans, in which he stated that WCP "would not provide any construction loan draws to 423 Kennedy".  Mr. Huertas knew that if the WCP did not fund construction draws, the 423 Kennedy development project, which was 75-80% complete, could not be completed.

21.     On November 15, 2022, Mr. Huertas sent another email to 423 Kennedy restating that WCP would not release any more construction draws.  By that date, the Lender Defendants also knew that the Borrowers were in the process of securing alternative financing for both properties with Main Street Bank, and that the Borrowers expected to close on the new refinancing loans in December of 2022.

22.     On November 20, 2022, the WCP transmitted another two Payoff Statements to 423 Kennedy because the WCP knew that 423 Kennedy was attempting to go to closing on a refinancing loan.  At that time there was still no claim made that any default existed under either of the loan documents.  None of those Payoff Statements included "Default Interest" or "Default Penalties", or any other amount based upon any claim that 423 Kennedy was in default.

8161\0002\4934-0098-3376.v1

23.     On November 30, 2022, RE1 made a request by email to the WCP for the payoff figures for both of its loans.  That same day, RE1 requested, and WCP agreed, to provide the payoff figures for both loans as of December 23, 2022.  The next day, Mr. Negussie contacted Mr. Huertas to inquire with WCP about whether the WCP would agree to extend the maturity date for the RE1 loans for six to twelve months.  Mr. Huertas replied that the only way an extension of the maturity date would be granted would be if RE1 paid down the First Note and the Second Note by $1 million to $1.5 million (in principal).

24.     Around December 6, 2022, Mr. Negussie contacted Mr. Huertas again to inquire whether WCP will be willing to extend the maturity date for the RE1 notes for six to twelve months if  RE1 paid down the notes by $500,000 to $750,000.  Mr. Huertas reiterated that, at a minimum, the notes needed to be paid down by $1 million.  *Id.*  Mr. Negussie then told Mr. Huertas that he would try to raise that amount ($1 million) from additional investors.

<u>The Lender Defendants Demand that the Borrowers Resolve Another Debt Owed to the WCP for Another, Unrelated Project, "Or  Else".</u>

25.     By December 8, 2022, the Borrowers had made all payments due under the notes and the WCP's records reflected that fact.  That same day, Mr. Huertas called Mr. Negussie. During that call, Mr. Huertas told Mr. Negussie that the lender and an unnamed investor were displeased with how the development of another, unrelated property (located at 2507 I Street, NW) had turned out.  For convenience, the unrelated development project at 2507 I Street, NW will be referred to as the "2507 I Street Project".  SF NU is believed to have a financial interest in the 2507 I Street Project.

26.     During that call, Mr. Huertas told Mr. Negussie that WCP was "withdrawing the payoff statements recently issued and that he was defaulting all loans [Mr. Negussie] was associated with at WCP," including RE1.  Mr. Huertas further stated that the 2507 I Street

6

Project has "turned out very bad" and that the person who lent the money to WCP ("Investor

Lender") to provide the loan to 2507 I St Holdings LLC, is "pissed off with the quality of the

work done", and that this investor "is very wealthy and will make life hard for you", and "has

now bought the notes" and another project financed by WCP, and that WCP is "defaulting the

loans."  Mr. Huertas also said: "why don't you do the honorable thing and have your investors

buy 2507 I St to make things right" or have them "take care of the $700,000" shortfall on the

2507 I Street Project.

      27.    During that call, Mr. Huertas further told Mr. Negussie that he should "do the

right thing" by arranging for an approximate $700,000 shortfall (on the 2507 I Street Project) to

be paid to the WCP Fund, and that if that did not happen, then the Lender Defendants and the

unnamed investor "would make trouble for you on all of your other projects".

      28.    In response, Mr. Negussie told Mr. Huertas that it was not appropriate for either

him (Mr. Huertas) or the WCP to be trying to force RE1, 423 Kennedy, or Mr. Negussie to pay

for the debts of someone else on an unrelated project, and that it was not appropriate for Mr.

Huertas or the WCP to be making threats to harm either Mr. Negussie or his related business

projects.

      29.    After Mr. Negussie refused to accede to Mr. Huertas' threats, Mr. Huertas stated,

in retaliation, that all prior Payoff Statements previously sent were withdrawn and that he would

place RE1 and 423 Kennedy in default under their loan documents with the WCP Fund.

      <u>Mr. Huertas Follows Up on His Threats, the WCP Demands Payment of More than $2.3
Million in "Default Interest" and "Default Penalties", and Threatens Foreclosure.</u>

      30.    Later that day, Mr. Huertas followed through with his threats to "make trouble"

for Mr. Negussie, 423 Kennedy, and RE1 by arranging for Leslie Calderas, a WCP Servicing

7

Manager, to send a letter entitled "Notice of Default" to RE1 and to 423 Kennedy (c/o Mr.

Negussie) by email.

31.    Each Notice of Default did not contain any legal basis or other explanation for

how or why either RE1 or 423 Kennedy had defaulted under any of the loan documents.  With

each Notice of Default, the WCP included new Payoff Statements (one for each loan).

32.    The Payoff Statements sent to by the WCP to RE1 included a demand for

payment of "Default Interest" of $276,776.00 and a "Default Penalty" $357,900.00 under the

first loan and "Default Interest" of $40,522.67 and a "Default Penalty" of $52,400.00 for under

the second loan.

33.    The new Payoff Statement sent by the WCP to 423 Kennedy included a demand

for payment of "Default Interest" of $456,927.95 and a "Default Penalty" of $868,969.30 under

the first loan and payment of "Default Interest" of $97,130.67 and a "Default Penalty" of

$125,600.00 under the second loan.

Mr. Huertas "Lawyers Up", Asks the WCP's Attorney (Mr. Drazin) to Come Up with A
Cover Story, and Mr. Drazin Follows Those Orders.

34.    Immediately after receiving default notices, Mr. Negussie called Mr. Huertas to

inquire as to the basis for why the WCP was suddenly now claiming that the Borrowers were in

default, but Mr. Huertas told Mr. Negussie that he would not talk about the basis for the defaults,

rather, Mr. Negussie would have to contact the WCP's counsel, Mr. Drazin.

35.    On information and belief, that same day Mr. Huertas called Mr. Drazin and told

him to scour through every provision of the loan documents to come up with a cover story to

justify the decision to declare that the Borrowers were in default when in fact all of the loans

were current.  As instructed, Mr. Drazin then sent to Borrowers' counsel a series of emails over a

8

period of several days in which Mr. Drazin kept coming up with different, additional claims as to why the Borrowers were in default under the loan documents.

36.     As of the date he was instructed by Mr. Huertas to go find defaults, Mr. Drazin knew that he had a fiduciary duty, as Trustee, to both the Borrowers and to the lender under the deed of trust, and that his representation of the WCP and the WCP Fund as counsel created an actual conflict of interest with his fiduciary duty as Trustee to the Borrowers.  Nevertheless, Mr. Drazin willfully ignored his fiduciary duty to the Borrowers and began to act solely on behalf of, and take instructions solely from, and provide legal advice to, the Lender Defendants.

37.     Mr. Drazin also knew that it was improper, and a breach of the fiduciary duty that he owed to the Borrowers, to try to find ways to justify -- after the fact -- the Lender Defendants' issuance of Default Notices to RE1 and 423 Kennedy on December 8, 2022.

38.     The Lender Defendants knew that by improperly alleging that the Borrowers were in default under the loan documents, and by adding $2.5 million more in "Default Interest" and "Default Penalt[ies]", the Borrowers would not be able to go to closing on any refinance loans. The Lender Defendant deliberately interfered with the refinancing of the loans with Main Street Bank to prevent the Borrowers from being able to refinance the loans and to improperly pressure them to pay someone else's debt (*i.e.*, for the 2507 I Street Project).

39.     The WCP and the WCP Fund refused to withdraw the default notices, refused to issue clean payoff statements, and refused to withdraw their foreclosure threats.  They also deliberately sabotaged the 423 Kennedy project by refusing to fund construction draws.  They timed their interference with the Borrowers refinancing of the loans during the approaching Christmas and New Year's holiday periods to make it impossible for them to close on any

refinancing loan with Main Street Bank prior to the end of 2022, and to tie up any refinancing indefinitely so that they could try to foreclose on the two properties.

<u>The Value of the Two Properties Owned by RE1 and 423 Kennedy</u>

40.     By the end of December 2022, the property owned by 423 Kennedy had been improved by 423 Kennedy and was 75-80% complete.  423 Kennedy had constructed a mixed use, six level building with thirty-three residential units and one commercial unit comprising 36,512 square feet.  The 423 Kennedy project would have been completed in the first quarter of 2023 but for the Lender Defendants' misconduct.

41.     Around December of 2022, the property owned by 423 Kennedy had a current value of $11.9 million, and the property owned by RE1 had a current value of $4 million.

<u>RE1 and 423 Kennedy File Lawsuits With the D.C. Superior Court.</u>

42.     423 Kennedy filed its first lawsuit on December 15, 2022 against the WCP, the WCP Fund, Mr. Huertas, and Mr. Drazin ("the WCP Defendants") in the case known as *423 Kennedy St Holdings, LLC. v. the WCP Fund, et al.,* Case No. 2022-CAB-005903 (D.C. Super. Ct.) ("*423 Kennedy I*").

43.     RE1 filed its lawsuit against the WCP Defendants on December 16, 2022 in the case known as *Developer RE1, LLC v. the WCP Fund I, LLC, et al.,* 2022-CAB-005935 (D.C. Super Ct.).[1]

44.     On December 23, 2022, RE1 and 423 Kennedy each filed a Motion for a Temporary Restraining Order that asked the D.C. Superior Court judges to enjoin the WCP Defendants from going forward with any foreclosure.

---

[1]     Filing the *423 Kennedy I* case before the RE1 case was the priority because the loan documents for 423 Kennedy had an earlier maturity date.

45.    On January 12 ,2023, RE1 filed a First Amended Complaint to correct a few typographical errors.  The WCP Defendants filed an Opposition to RE1's TRO Motion on January 17, 2023, with a Reply filed by RE1 on January 24, 2013.

The First TRO Hearing in *423 Kennedy I.*

46.    The TRO Motion filed in *423 Kennedy I* was set for a hearing on February 7, 2023.  The judge at that hearing determined that because an actual foreclosure notice had not been issued, there was no threat of imminent harm to 423 Kennedy, which resulted in *423 Kennedy I* being dismissed, without prejudice.

47.    Because it seemed unlikely that another judge would grant a TRO to RE1 given the "lack of imminent harm" decision in *423 Kennedy I*, and to facilitate settlement discussions, RE1 voluntarily withdrew its TRO Motion on February 28, 2023.

Initial Settlement Talks After the First TRO Decision.

48.    On March 20, 2023, the parties met at Mr. Drazin's office in the District, and after that first meeting the parties exchanged various settlement proposals by email, but no agreement was reached as the parties were very far apart on the economic terms and on the issues of whether the disputes could be settled together on a global basis.

The Motion to Dismiss Filed in the RE1 Case is Denied.

49.    The WCP Defendants moved to dismiss RE1's First Amended Complaint on January 16, 2023, which RE1 opposed on February 16, 2023.  No reply was filed, and the motion to dismiss was not denied by Judge Ebony Scott until an oral ruling at the Initial Scheduling Conference on March 24, 2023.  Judge Scott later issued a Track II Scheduling Order that set a discovery closed deadline of August 10, 2023 along with a subsequent order dated April 7, 2023 that memorialized her oral decision to deny the motion to dismiss.

8161\0002\4934-0098-3376.v1

The Lender Defendants Issue Foreclosure Notice for Both Properties.

50.     The initial threats of foreclosure by the WCP turned into a reality.  On June 23, 2023, SF NU sent RE1 a notice of foreclosure sale and the WCP Fund sent a Notice of Foreclosure to 423 Kennedy.  Both foreclosure notices were signed by Mr. Drazin.  The foreclosure sales for the two properties were both scheduled for July 25, 2023 (at 2:00 p.m. for RE1 and 2:10 p.m. for 423 Kennedy) at the office of Harvey West Auctioneer's, Inc.

RE1 Renews Its TRO Motion and 423 Kennedy Files a New Lawsuit and TRO Motion Against the Lender Defendants.

51.     On July 11, 2023, RE1 filed a renewed TRO Motion to stop the foreclosure on its property.

52.     On July 12, 2023, the Borrowers sent a joint letter to Mr. VerStandig demanding that the foreclosure notices be withdrawn and that Mr. Drazin resign as trustee due to his conflict of interest.  Neither demand was met.  The next day, 423 Kennedy filed a new case against the WCP Defendants in *423 Kennedy St Holdings, LLC v. The WCP Fund, et al.,* Case No. 2023-CAB-004260 (D.C. Super. Ct.) ("*423 Kennedy II*").  In *423 Kennedy II*, 423 Kennedy added affirmative claims against Mr. Drazin for breach of his fiduciary duty as Trustee and seeking declaratory judgments that (a) Mr. Drazin could not serve as trustee and (b) that the foreclosure notice that he issued was invalid.[2]

53.     RE1 took the deposition of Mr. Huertas on July 18, 2023.  At his deposition, Mr. Huertas was unable to explain how RE1 was in default under its loan documents.  In response to

---

[2]     The *423 Kennedy II* claims included: breach of contract (Count I); tortious interference with business relations (Count II); breach of the duty of good faith and fair dealing (Count III); breach of fiduciary duty by the Trustee (Count IV), for declaratory judgment and injunctive relief to stop the foreclosure (Count V); declaratory judgment (Mr. Drazin cannot serve as Trustee and the foreclosure notice is invalid) (Count VI), and that the loan documents contain unenforceable liquidated damages provisions that constitute a penalty (Count VII).

multiple questions about the basis for the alleged defaults, all that Mr. Huertas could say, in conclusory fashion, was that: "the borrower was in default" without providing any explanation as to the basis for the default under the loan documents. Near the end of that day's testimony, Judge Milton Lee's chambers sent an email to all counsel notifying them that he had set a hearing on 423 Kennedy's TRO Motion for Friday, July 21, 2023 at 1:00 pm.

The Hearing on 423 Kennedy's TRO Motion and Order Granting That Motion.

54.     Mr. Negussie gave testimony on behalf of 423 Kennedy at the TRO hearing before Judge Milton Lee on Friday, July 21, 2023, which testimony largely mirrored the allegations in the complaint in *423 Kennedy II*. The Lender Defendants did not rebut Mr. Negussie's testimony, either by submitting a contrary affidavit or by calling a witness that gave contrary testimony. The Lender Defendants called one accounting department witness whose testimony primarily consisted of authenticating a record of 423 Kennedy's loan payments kept by the WCP.

55.     On Monday, July 24, 2023, Judge Milton Lee issued an order granting 423 Kennedy's TRO Motion. In that order, Judge Lee credited Mr. Negussie's testimony; rejected nearly all the arguments made by the Lender Defendants, and determined that 423 Kennedy was likely to prevail on the merits as to its claims.

The Hearing on RE1's TRO Motion and Decisions Granting that Motion.

56.     On July 24, 2023, Judge Scott issued an order setting a hearing RE1's Renewed TRO Motion for July 25, 2023 at 10:30 a.m. Mr. Negussie gave testimony on behalf of RE1 at that hearing. Once again, the Lender Defendants did not rebut Mr. Negussie's testimony, either by submitting a contrary affidavit or by calling a witness that gave contrary testimony at the hearing. The Lender Defendants again called the same accounting department witness, whose

testimony again primarily consisted of authenticating a record of RE1's loan payments kept by the WCP.

57.     After excusing the parties during a recess, Judge Scott issued an oral decision granting RE1's TRO Motion and determining that RE1 was likely to prevail on the merits as to its claims.  At that hearing the Lender Defendants requested that Judge Scott set a trial date, which she reserved for September 9, 2024.[3]  Judge Scott later memorialized her oral decision granting the TRO Motion in a written order dated August 15, 2023.

<u>The Discovery "Cease Fire" and Private Mediation with JAMS.</u>

58.     After the two TRO decisions, the parties agreed to put the brakes on taking any further depositions and responding to pending discovery requests and instead focus their efforts on trying to resolve their disputes through a private mediation with JAMS.  To allow for that mediation, the parties sought joint extensions of the Scheduling Order deadlines on both cases. The mediation first scheduled to take place in mid-December 2023 was rescheduled to early 2024.

59.     The Borrowers and the WCP Defendants attended two mediation sessions with a retired judge with JAMS.  The first session took place in person on January 9, 2024 at JAMS' office, but no agreement was reached, so a second session was scheduled for January 25, 2024 via Zoom.  The second session, however, ended abruptly when Mr. Huertas unilaterally decided that negotiations were over.

60.     After the second session, the Borrowers sent multiple additional settlement proposals to Lender Defendants' counsel by email, but those proposals were mostly met with

---

[3]     Judge Scott noted that it was unusual for her to schedule a trial date so early in the case (trial dates are not usually set until after a pre-trial conference), but she was persuaded by the Lender Defendants to set an expedited trial date of September 9, 2024.

silence -- sometimes for several weeks -- and/or a rejection (by email) without any

counterproposal.  The Lender Defendants finally responded to a March 4, 2024 proposal on

March 29, 2024, but in that response they moved in an opposite direction from prior proposals.

RE1 Files a Second Amended Complaint.

61.     On March 1, 2024, RE1 filed an unopposed Motion for Leave to File a Second

Amended Complaint to more closely mirror the claims in *423 Kennedy II* and to add SF NU as

defendant because SF NU (not the WCP Fund) issued the foreclosure notice to RE1.

62.     The motion for leave was granted on March 7, 2024.  SF NU was served with the

Second Amended Complaint on March 26, 2024.  The WCP Defendants filed an Answer to the

Second Amended Complaint along with a Counterclaim (filed by the WCP Fund) on April 2,

2024.

The Lender Defendants Create JPK NewCo, and Transfer Some Loan Documents to It.

63.     Unbeknownst to the Borrowers, the Lender Defendants had created JPK NewCo

and arranged for some, but not all, of the Borrowers' loan documents to be transferred to that

entity around April 15-16, 2024.  By that date, settlement discussions were over.

The Lender Defendants Start Creating More Roadblocks in the Superior Court Cases.

64.     On April 21, 2024, less than a week after some loan documents were transferred

to JPK NewCo, SF NU filed a motion to dismiss the Second Amended Complaint in RE1 case.

In the motion to dismiss, SF NU claimed that JPK NewCo was an indispensable party because

"JPK NewCo owns the note, and holds the rights arising under the correlative deed of trust."

65.     The Lender Defendants used the fact that they transferred some loan documents to

JPK NewCo as a basis for the entire RE1 case to be dismissed.  In hindsight, it is clear that the

Lender Defendants wanted RE1 to amend its complaint to include JPK NewCo because they

were planning to put JPK NewCo into bankruptcy, but RE1 did not take the bait.

8161\0002\4934-0098-3376.v1

66.    On April 23, 2024, RE1 filed a motion to dismiss the WCP Fund's Counterclaim as untimely.  On May 6, 2024, RE1 filed an opposition to SF NU's motion to dismiss.

67.    On May 7-8, 2024, 423 Kennedy served its first set of interrogatories and requests for the production of documents on the Lender Defendants.  In interrogatory answers (dated June 7, 2024), the WCP Defendants disclosed that they were "knowledgeable about [JPK NewCo's] acquisition of the promissory note and deed of trust, from WCP."

68.    On June 7, 2024, the parties filed a joint motion to consolidate the two cases, and on June 11, 2024, the Judge Scott issued an order consolidating the two cases, designating the RE1 case (2022-CA-005935-B) as the lead case in which all future filings should be made.

69.    At no time during discovery did the Lender Defendants produce any documents: (a) about the formation of JPK NewCo.; (b) showing how and for what consideration JPK NewCo acquired "the promissory note and deed of trust from the WCP"; or (c) documents showing any related communications concerning those transactions.  The Lender Defendants also never produced a privilege log or any copies of any legal bills for the services of Mr. VerStandig.

70.    The Lender Defendants also did not serve any discovery requests on 423 Kennedy, nor did they note any depositions, even though a trial was scheduled for September 9, 2024.  The Lender Defendants also did not assert any counterclaim against 423 Kennedy for the amounts allegedly due under the loan documents.

71.    The facts listed in paragraphs 64-70 are all "tells" that the Lender Defendants never really planned to go to trial on September 9, 2024 because they had secretly transferred the rights under some of the Borrower's loan documents to JPK NewCo and were planning to put JPK NewCo into bankruptcy.

72.     On June 26, 2024, the Clerk's office sent notice of the Trial Readiness hearing that was set for September 6, 2024.

73.     On July 3, 2024 at 6:04 pm, the Borrowers noted the depositions of all of the Lender Defendants and of multiple fact witnesses (employees of the WCP) to take place back-to back on July 8-9, 2024.  Just a few hours later (11:50 pm), the Lender Defendants filed a notice of removal of the now consolidated cases resulting in the Adversary Proceeding entitled *Developer RE1, et al., v. WCP Fund I, LLC, (In re Paret),* Adv. Pro. 24-10023-ELG ("Removed AP Case").

74.     During the next few days, the Lender Defendants "flooded the zone" by filing multiple additional motions and notices in the Removed AP Case.  *See* ECF Nos. 3-9 (filed in Adv. Pro. 24-10023-ELG).

75.     It is obvious from the timing that the Lender Defendants filed a notice of removal to prevent the Borrowers from taking deposition, then later put JPK NewCo into bankruptcy to ensure further that the September 9, 2024 trial did not take place.

76.     On July 21, 2024, the Borrowers moved to remand the Removed AP Case to the D.C. Superior Court, arguing, *inter alia,* that the removal was untimely.  *See* ECF # 13 (filed in Adv. Pro. 24-10023-ELG).

E.   FACTUAL BACKGROUND REGARDING *JPK NEWCO I*
AND THE FORMATION OF JPK NEWCO.

77.     On July 23, 2024 (at 8:51 a.m.), the same morning that a hearing was being held in the Removed AP Case (at 10:00 a.m.), Shaheen Sariri ("Sariri") filed an involuntary Chapter

17

11 Petition against JPK NewCo through counsel, Kristen Burgers.  The Involuntary Petition

stated that Sariri was owed $51,443.52 under a Promissory Note.  ECF # 1 in *JPK NewCo I*. [4]

79. 80. The Involuntary Summons was issued by the Clerk's Office on July 24, 2024 and

a Certificate of Service of the Involuntary Petition and Summons was filed on July 25, 2024.

ECF ## 3-4 in *JPK NewCo I*.

79. The Certificate of Service states that Ms. Burgers served copies of the Summons

and Involuntary Petition on JPK NewCo by first-class mail, postage prepaid, on July 25, 2024.

ECF # 4 in *JPK NewCo I*.

80. On August 6, 2024, JPK NewCo consented to the Involuntary Petition and elected

to proceed under subchapter V of Chapter 11 of the Bankruptcy Code.  ECF # 6 in *JPK NewCo I*.

81. An Order for Relief was entered on August 7, 2024.  ECF # 8 in *JPK NewCo I*.

82. On August 20, 2024, WCP Fund, Mr. Huertas, the other defendants and JPK

NewCo, as debtor-in possession, all through counsel Mr. VerStandig, filed an opposition to the

motion to remand the Removed AP Case.  *See* ECF# 20 (filed in Adv. Pro. 24-10023-ELG).

That opposition argued, among other things, that the "litigation will have a momentous impact

upon the administration of two separate bankruptcy estates, while also being likely dispositive of

[JPK NewCo's] ability to reorganize." *Id.* p. 1.

83. On August 28, 2024, the Court held a hearing on the motion to remand and

determined that it did have jurisdiction over the Removed AP Case, but that all proceedings in it

should be stayed pending resolution of an expected motion to dismiss this bankruptcy case,

among other reasons.

---

[4]    Many of the facts in paragraphs 77- 105 have been copied, in whole or in part, from the
U.S. Trustee's Motion to Dismiss *JPK NewCo I*.  *See* ECF # 37 *in JPK NewCo I*.  Based upon all
information available to the Borrowers thus far, the Borrowers believe those facts to be accurate.

JPK NewCo's Lack of Any Indicia That It is a Legitimate Company and the Lender
Defendants' Collusive Efforts to Create Federal Jurisdiction.

84.    JPK NewCo was formed more than a year after the D.C. Superior Court cases

were filed.  Since its formation, JPK NewCo has conducted no legitimate business.  It has no

employees, it generates no income from sales, it produces no goods, and it provides no services.

85.    JPK NewCo's principal place of business is the WCP's offices in McLean, VA –

an address that is also shared with the WCP Fund and where Mr. Huertas' office is located.

Until April 15, 2024, JPK NewCo existed simply as a shell entity.

86.    On April 15, 2024, the WCP Fund and SF NU, while still defendants in the

Consolidated Cases, assigned some or all their interests in the RE1 loan and the 423 Kennedy

loan to JPK NewCo.  Although the assignment documents indicate that the assignments were

"for value received," given that JPK NewCo had no money and provided no services, it appears

that these assignments were actually for no consideration.

87.    On June 3, 2024, when the discovery period in the Consolidated Cases was

nearing completion, Shaheen Sariri, a friend of Mr. Huertas, "loaned" JPK NewCo $50,000,

which JPK NewCo, despite having no income or assets other than assigned notes that would

yield no income due the TRO Orders in the Consolidated Cases, was supposed to repay, in full

with 10.55% annual interest, two months later on August 3, 2024.  The first payment was due on

July 1, 2024.  A true and correct copy of the Sariri Note was attached as Exhibit 1 to the U.S.

Trustee's motion to dismiss *JPK NewCo I*.  ECF # 37-1 in *JPK NewCo I*.

88.    Given that JPK NewCo had no ability to repay this "loan" to Mr. Sariri, it is

obvious that this "loan" was a sham.  Indeed, it was never intended that JPK NewCo would

repay this loan.  Rather, the purpose of this "loan" arrangement was to cause JPK NewCo to

incur a debt to a single individual, Mr. Sariri, so Mr. Sariri could then initiate an involuntary

19

bankruptcy against JPK NewCo, thereby giving the Lender Defendants another potential ground to allow this Court, which they perceive as a friendlier forum, to have jurisdiction over all or part of the Borrowers' claims.

89.     Once JPK NewCo received the "loan" from Mr. Sariri on June 21, 2024, it dispersed those funds as follows.  First, on June 25, 2024, it gave $23,000 to Mr. VerStandig to hold until the involuntary bankruptcy was filed at which time it would be used to retain bankruptcy counsel for JPK NewCo.  At some time after JPK NewCo transferred this money to Mr. VerStandig, but before this bankruptcy case was commenced, Mr. VerStandig contacted Jeffrey Orenstein to arrange for him to represent JPK NewCo once the involuntary petition was filed.[5]

90.     Second, on June 25, 2024, JPK NewCo loaned the remaining $26,000 to an entity known as Energy Morroco, LLC,[6] a loan that was not scheduled to be repaid (other than a $325 interest payment to be made each month) until December 21, 2024 (well after the "loan" from Mr. Sariri was due to be paid in full).  A true and correct copy of the Energy Morroco Loan Agreement was attached as Exhibit 2 to the U.S. Trustee's motion to dismiss JPK NewCo I.  *See* ECF # 37-2 in *JPK NewCo I.*

91.     The purpose of the loan to Energy Morroco, LLC, was to give JPK NewCo the appearance of carrying on some type of legitimate business activity.

92.     All available information to date indicates that the plan to create federal jurisdiction through the loan from Mr. Sariri and a subsequent bankruptcy filing by JPK NewCo

---

[5]     Mr. Orenstein has acknowledged that he was contacted by Mr. VerStandig in early 2024 regarding the potential representation of one of Mr. VerStandig's clients in a Chapter 11 filing.

[6]     The Note signed by Energy Morroco LLC identifies it as a Delaware LLC.  Delaware and District of Columbia online public records show that the entity is named Energy Morocco (one "r", not two) LLC.  The Note is dated June 24, 2024.

8161\0002\4934-0098-3376.v1

was created and carried out on the advice of the Lender Defendants' and JPK NewCo's attorney,

Mr. VerStandig.

93.     Given that on July 1, 2024, when the first payment to Mr. Sariri came due, JPK

NewCo had (by design) no cash on hand to repay the "loan", it failed to make its first payment to

Mr. Sariri.  Then, on July 23, 2024, Mr. Sariri filed an involuntary Chapter 11 petition against

JPK NewCo.  There is no evidence that any demand for payment was ever made by Mr. Sariri.

94.     Before JPK NewCo was served with the involuntary petition (*see* ECF # 4 in *JPK

NewCo I*), Mr. VerStandig contacted Mr. Orenstein to obtain his banking information in order to

wire Mr. Orenstein the $23,000 that Mr. VerStandig was holding for JPK NewCo.[7]

95.     The next day, on July 24, 2024, the Court issued the summons in this bankruptcy

case.  *See* Doc. 3 in *JPK NewCo I*.

96.     That same day, on July 24, 2024, a day before JPK NewCo was served with the

involuntary petition, Mr. VerStandig wired the $23,000 to Mr. Orenstein to be used as a retainer

for Mr. Orenstein's representation of JPK NewCo.

97.     On July 25, 2024, a day after Mr. Orenstein received the retainer to represent JPK

NewCo in this bankruptcy case, Mr. Sariri served, by regular mail, a copy of the summons and

involuntary petition, on JPK NewCo.  *See* ECF # 4 in *JPK NewCo I*.

98.     Mr. Orenstein's engagement agreement with JPK NewCo is dated as of July 30,

2024.  A true and correct copy of the engagement agreement was attached as Exhibit 3 to the

U.S. Trustee's motion to dismiss *JPK NewCo I*.  *See* ECF # 37-3 in *JPK NewCo I*.

---

[7]     Although service was legally accomplished on July 25, 2024, that service was by regular
mail, so JPK NewCo could not have actually received service by regular mail on July 25, 2024.
*See* ECF # 4 in *JPK NewCo I*.

8161\0002\4934-0098-3376.v1

99.     On August 6, 2024, JPK NewCo answered the involuntary petition and consented to be a debtor in this case.  *See* ECF # 6 in *JPK NewCo I*.

100.    On August 6, 2024, Mr. Orenstein filed an application to be employed as NewCo's bankruptcy counsel.  *See* ECF # 5 in *JPK NewCo I*.  On that same date, Mr. VerStandig filed an application to be employed as special counsel for JPK NewCo, to represent it in the Consolidated Cases.  *See* ECF # 12 in *JPK NewCo I*.  As of August 6, 2024, JPK NewCo was not a party in the Consolidated Cases.

101.    On August 20, 2024, the Borrowers filed an Objection to the Application to Employ Mr. Orenstein and his firm.  *See* ECF # 14 in *JPK NewCo I*.  Doc. No.  14.

102.    On August 26, 2024, the Borrowers filed an Objection to the Application to Employ Special Counsel.  *See* ECF # 15 in *JPK NewCo I*.

103.    On September 4, 2024, the U.S. Trustee filed and Objection to the Application to Employ Mr. Orenstein, an Objection to the Application to Employ Mr. VerStandig as Special Counsel, and a Motion to Return Compensation.  *See* ECF ## 20-22 in *JPK NewCo I*.

104.    On September 17, 2024, the U.S. States Trustee filed a Supplemental Opposition to the Applications and the Motion to Return Compensation.  *See* ECF ## 31 in *JPK NewCo I*.

105.    On September 18, 2024, Mr. VerStandig filed his Reply in Support of Application to Approve Employment of Maurice B. VerStandig, Esq. and The VerStandig Law Firm As Special Counsel To JPK NewCo LLC and Opposition To Motion For Return Of All Compensation Received From Or On Behalf Of Debtor.  *See* ECF #34 in *JPK NewCo I*.

106.    On September 18, 2024, Mr. Orenstein and Wolff & Orenstein, LLC filed their Opposition to Motion for Return of all Compensation Received from or on Behalf of the Debtor. *See* ECF #35 in *JPK NewCo I*.

107.    On September 23, 2024, the U.S. Trustee filed a motion to dismiss *JPK NewCo I* for cause under 11 U.S.C. § 1112(b).  *See* ECF #37 in *JPK NewCo I.*

108.    At a hearing on September 25, 2024 regarding the motions to employ (and the motion to disgorge) the Court granted the applications to employ Mr. Orenstein and Mr. VerStandig and thereafter Mr. Orenstein filed additional documents on behalf of JPK NewCo. *See* ECF # 41 in *JPK NewCo I* (audio file from the hearing).

109.    Mr. Sariri and the WCP Fund each filed separate Oppositions to the U.S. Trustee's motion to dismiss.  JPK NewCo's opposition incorporated the opposition filed by the WCP Fund.  *See* ECF ## 48 (Mr. Sariri's Opposition), and 56 (WCP Fund's forty-page Opposition), and 58 (JPK NewCo' Opposition) in *JPK NewCo I.*

110.    The WCP Fund has admitted that JPK NewCo was created as a separate entity to "to firewall any liability [to the Borrowers] from reaching WCP or its various co-defendants." *See* ECF #56 at 6, ¶¶ 15 (WCP Opposition filed in 24-00262).  The WCP fund also represented to this Court that JPK NewCo was formed to be ". . . focused on addressing multiple litigation claims and thusly likely sheltering WCP and SNL from the ultimate economic reach of the subject litigation claims." *Id.* ¶ 18.

111.    The Borrowers filed a Statement in Support of the US Trustee's motion to dismiss on October 14, 2024.  *See* ECF ## 57 in *JPK NewCo I.*

112.    At a status hearing on October 16, 2024 on the U.S. Trustee's motion to dismiss, the parties generally discussed the discovery schedule and the Court set two dates for an evidentiary hearing starting on January 28, 2025 and continuing January 30, 2025 (if needed).

113.    Toward the end of the October 16, 2024 status hearing, Special Counsel *in JPK NewCo I* mentioned that "yesterday" JPK Newco received a first quarterly fee invoice from the

U.S. Trustee's office for the first quarterly fee and suggested that it was "equity's" position that "no quarterly fee has come due or will come due." *See* ECF # 59 in *JPK NewCo I* (starting at 0:06:40 into the recording).

114.    At a status conference on November 6, 2024, the January 2025 evidentiary hearing dates were moved to February 4 and 6, 2025 due to Mr. Ornstein's unavailability on January 30, 2025.  At that hearing the Court declined to set any Plan hearings giving the pendency of the U.S. Trustee's motion to dismiss, so February 4, 2025 was set as the new status conference for the Plan.  *See* ECF # 69 in *JPK NewCo I* (audio recording from the hearing).

115.    The Court entered a Scheduling Order for the deadlines as to the U.S. Trustee's motion to dismiss on November 13, 2024, but that order was later modified by an amended scheduling order on January 7, 2025 that continued the discovery completion date to  March 4, 2025.  *See* ECF ## 70 and 76 in *JPK NewCo I.*

116.    On February 25, 2025, *JPK NewCo I* was dismissed without prejudice in a Consent Order Granting the U.S. Trustee's motion to dismiss.  The sole basis listed for dismissal was JPK NewCo's failure to pay quarterly fees to the U.S. Trustee's office.  *See* ECF ## 85 in *JPK NewCo I.*

The WCP Fund Inserts Conditions in the Proposed Settlement Agreement (in the Charles Paret Chapter 7 Case) to Bootstrap Its Arguments About Federal Jurisdiction in the Removed Cases.

117.    On March 28, 2025, The Chapter 7 Trustee in the Charles Paret involuntary bankruptcy case filed a Motion for Approval of Settlement Agreement Pursuant to Fed. R. Bankr. P. 9019.  *See* ECF # 158 in 23-00217-ELG.

118.    The Settlement Agreement involved the proposed resolution of claims in a Third Amended Complaint, in which it was alleged by the Chapter 7 Trustee, *inter alia,* that a partnership existed between Mr. Paret and Mr. Huertas involving fourteen different properties

24

and twenty-one limited liability companies.  *See* ECF #38 in 23-10025 (Line filing copy of the

Third Amended Complaint) at 8-9 (listing the properties) and 11-2 (listing the LLCs) (the "Paret

AP Case").

119.    Mr. Huertas, the WCP Fund, and the WCP contested the claims in the Paret AP

Case at every stage, denying, among other things, that any partnership existed,  *See, e.g.,* ECF ##

3, 15, and 41 in 23-10025 (multiple motions to dismiss filed by Mr. Huertas, the WCP Fund, and

the WCP).

120.    Despite vehemently contesting the partnership claims in the Paret AP Case, as

part of the proposed settlement, Mr. Huertas, the WCP Fund and the WCP propose giving Mr.

Paret a "limited partnership interest" in the two properties owned by the Borrowers and no other

properties.  *See* ECF # 158-1 in 23-00217-ELG (proposed Settlement Agreement), Sections 3-4.

121.    The Borrowers and four other parties in interest have filed an objection to the

proposed settlement.  *See* ECF ## 162-165 in 23-00217-ELG.

## F.   THE LEGAL STANDARDS FOR DISMISSING A PETITION FILED IN BAD FAITH

On a request by a party in interest, after notice and hearing, the Court may dismiss or

convert a chapter 11 case to a case under chapter 7, whichever is in the best interests of the

creditors and the estate for "cause".  11 U.S.C. § 1112(b)(1).  Section 1112(b)(4) contains a non-

exhaustive list of circumstances that may constitute "cause" for dismissal.  *See* 11 U.S.C. §

1112(b)(4).  The Fourth Circuit has noted that courts are duty bound to conduct an inquiry, if

requested, to determine whether a petition has been filed in good faith.  *See In re United States*

*Optical, Inc.*, 1999 U.S. App. LEXIS 6960 at *15-16 (4th Cir. 1993) (involving an involuntary

petition).

25

There is no definition of "good faith" in the Bankruptcy Code; the finding is fact-specific. *See In re Sawyer*, No. 07-10252 SSM, 2007 WL 1275627, at *5 (Bankr. E.D. Va. June 13, 2007), opinion corrected, No. 07-10252 SSM, 2007 WL 2110314 (Bankr. E.D. Va. July 17, 2007).  While multiple bankruptcy courts have held that a bankruptcy petition can be dismissed when the petition was filed in bad faith, the courts have used different, but similar, standards. For the Court's convenience, and because the Borrowers could not find a D.C. Circuit decision addressing the issue, the Borrowers have included a summary of the various standards that have been used when considering whether to dismiss a petition filed in bad faith.

1.     The Prior Decisions From this Court.

In *Franklin Mortg. & Inv. Co.,* 143 B.R. 295 (Bankr. D.D.C. 1992), Judge Martin S. Teel noted that even though Chapter 11 does not contain a specific "good faith" requirement, "courts have consistently imposed such a requirement by way of implication."  *Franklin* 143 B.R. at 299 (Bankr. D.D.C. 1992) (collecting cases).  The *Franklin* decision further noted that "[w]hether a case was filed in bad faith generally cannot be determined by direct evidence, but it may be inferred from surrounding circumstances. *Id.*  In *Franklin*, the Debtor was formed prior to the bankruptcy for the purpose of owning commercial real estate on Worth Avenue in Palm Beach, Florida, which was subject to a foreclosure action by the secured lender.  In granting the secured lender's motion to dismiss, Judge Teel applied the eight factors evidencing bad faith established by the Fifth Circuit in *Little Creek Development Co.,* 779 F.2d 1068, 1073 (5th Cir. 1986).  *Id.* The eight *Little Creek Development* factors include:

> (a) whether the debtor has one asset, (b) whether the asset is encumbered by secured liens, (c) whether the debtor has any business operations, (d) *whether the debtor has few unsecured creditors with small claims,* (e) *whether the debtor and one creditor had litigated to a standstill in state court,* (f) whether bankruptcy was the only viable way to forestall loss of the property, (g) *whether there were any allegations of wrongdoing by*

> the debtor or its principals, and (h) *whether the debtor suffers from "new debtor syndrome."*

*Id.* pp. 299-300 (italic emphasis added). The *Franklin* decision also cited to Section 1112(b). *Id.* ("I agree that the broad 'for cause' language in section 1112(b) supports the view that a debtor's lack of good faith may constitute cause for dismissal of a chapter 11 petition"). *See also In re Blue Chip Cap., DC, LLC,* 600 B.R. 735, 736–38 (Bankr. D.D.C. 2019) (noting that "[T]he bankruptcy courts are inherently empowered to dismiss cases in order to protect their jurisdictional integrity" and finding that "[t]he evidence established cause for dismissing the case under 11 U.S.C. § 1112(b)(1)", which included a lack of good faith).

2.    The Second Circuit Test Used for Bad Faith

The Second Circuit used a multi-factor test to determine bad faith in *In Re C-TC 9th Ave. P'ship*, 113 F.3d 1304 (2d Cir. 1997), where it noted the following factors used in an analogous case:

> (1) the debtor has only one asset; (2) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default; (3) the debtor's financial condition is, in essence, a two-party dispute between the debtor and secured creditors; (4) *the timing of the filing evidences an intent to delay or frustrate legitimate collection efforts;* (5) *the debtor has little or no cash flow*; (6) the debtor cannot meet current expenses; (7) *the debtor has no employees.*

*C-TC 9th Ave. P'ship*, 113 F.3d at 1311 (italic emphasis added) (citing to the *Pleasant Pointe* factors used in *Pleasant Pointe Apartments, Ltd. v. Kentucky Hous. Corp.,* 139 B.R. 828 (W.D. Ky. 1992).

3.    The Third Circuit Test Used for Bad Faith.

*In re Forever Green Ath. Fields, Inc.*, 804 F.3d 328, 336 (3d Cir. 2015) the third circuit applied a "totality of the circumstances" test to the involuntary petition context. The factors the *Forever Green* court listed were:

> (1) whether the creditors satisfied the statutory criteria for filing the petition; (2) *whether the petition was meritorious*; (3) whether the creditors made reasonable inquiry into the relevant facts and pertinent law before filing; (4) whether there was evidence of preferential payments to certain creditors; (5) *whether the filing was motivated by ill will or a desire to harass;* (6) *whether the filing was used to obtain a disproportionate advantage*; (7) *whether the filing was used as a substitute for customary debt-collection procedures.*

*Forever Green*, 804 F.3d at 336 (collecting cases) (italic emphasis added).  The determination of bad faith is "a fact intensive determination better left to the discretion of a bankruptcy court." *See, e.g.*, *In re Lilley*, 91 F.3d 491, 496 (3d Cir. 1996) (applying a "totality of the circumstances" standard for determining bad faith under 11 U.S.C § 303).  More recently, the third circuit announced a new rule that good-faith filing of a Chapter 11 petition requires the debtor to show it is facing financial distress "immediate enough to justify filing." *In re LTL Mgt., LLC*, 64 F.4th 84 (3d Cir. 2023).

4.    The Fourth Circuit Test Used for Bad Faith.

In *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989), in deciding whether to dismiss or convert a Chapter 11 case, the fourth circuit looked at findings of objective futility and subjective bad faith.  The *Carolin Corp.* decision noted that courts presented with the question of bad faith have uniformly held that: "[G]enerally, an implicit prerequisite to the right to file [a Chapter 11 petition] is 'good faith' on the part of the debtor, the absence of which may constitute cause for dismissal . . . ." *Carolin Corp.*, 886 F.2d at 698 (citing *In re Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir. 1985) and 2 L. King, *Collier on Bankruptcy* § 301.05[1] (15th ed. 1979).  The *Carolin Court* further noted:

> We agree with the other courts that have so held and conclude that a good faith filing requirement is implicit in several specific provisions of the bankruptcy code, interpreted in light of established policy considerations underlying the code's provision of bankruptcy protection. …. [A] good faith requirement[:]  *prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without*

28

> *benefiting them in any way* or to achieve reprehensible purposes.
> Moreover, a good faith standard *protects the jurisdictional integrity of
> the bankruptcy courts* by rendering their powerful equitable weapons
> (i.e., avoidance of liens, discharge of debts, marshalling and turnover of
> assets) available only to those debtors and creditors with "clean hands."

*Id.* p. 698 (citing *Little Creek Development).*  To make a finding of bad faith, no single factor is

considered determinative and any conceivable list of factors is not exhaustive.  *Id.* p. 701 (citing

*In re Natural Land Corp.,* 825 F.2d 296, 298 (11th Cir. 1987); *see also In re Dunes Hotel

Assocs.*, 188 B.R. 162, 169 (Bankr. D.S.C. 1995) ("In making a determination regarding

allegations of bad faith, the Court must examine the totality of the facts of the case.").

    5.   <u>The Fifth Circuit Test Used for Bad Faith.</u>

The *Franklin* decision correctly quoted the eight bad faith factors from the fifth circuit's

decision in *Little Creek Development,* so those factors will not be repeated here.  *Little Creek

Development* not only noted the "clean hands" requirement for a debtor, but also noted "the

bankruptcy court's responsibility to enforce a standard of good faith":

> A court of equity may in its discretion in the exercise of the jurisdiction
> committed to it grant or deny relief upon performance of a condition
> which will safeguard the public interest . . . These principles are a part of
> the control which the court has over the whole process of formulation and
> approval of plans of composition or reorganization. . . .

*Little Creek Development*, 779 F.2d at 1072 (citing *American United Mut. Life Ins. Co. v. City of

Avon Park*, 311 U.S. 138, 145 (1940) (quoting *SEC v. United States Realty & Improvement Co.*,

310 U.S. 434, 455 (1940)).

    6.   <u>The Eleventh Circuit "Any Factors" Test Used for Bad Faith.</u>

In *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393 (11th Cir. 1988),  the eleventh circuit

chose not to include a list of bad faith factors, noting instead that:

> There is no particular test for determining whether a debtor has filed a
> petition in bad faith. Instead, the courts may consider any factors which
> evidence 'an intent to abuse the judicial process and the purposes of the

29

> reorganization provisions' or, in particular, factors which evidence that
> the petition was filed 'to delay or frustrate the legitimate efforts of
> secured creditors to enforce their rights.'

*Phoenix Picadilly,* 849 F.2d at 1394, *(citing In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th

Cir.) at 674)).

       7.    <u>Additional Cases Addressing Bad Faith.</u>

     In *McDow v. Smith*, 295 B.R.69, 79-81 n. 22 (Bankr. E.D. Va. 2003) a bankruptcy judge

aggregated (from a combination of cases) the lists of bad faith factors that are typically

considered:

> (1) The debtor's concealment or misrepresentation of assets; (2) the
> debtor's lack of candor and completeness in his statements and
> schedules; (3) *whether the debtor has sufficient resources to repay his
> debts;* (4) *whether the debtor's motivation in filing is to avoid a large
> single debt incurred through conduct akin to fraud,* misconduct, or gross
> negligence; (5) *whether the debtor's petition is part of a deliberate and
> persistent pattern of evading a single creditor;* (6) *whether the debtor is
> overutilizing the protection of the Code to the detriment of his creditors*;
> (7) whether the debtor reduced his creditors to a single creditor prior to
> filing the petition; (8) *the debtor's lack of attempt to repay creditors;* (9)
> *the debtor's payment of debts to insider creditors;* (10) *the debtor's
> procedural gymnastics that have the effect of frustrating creditors;* and
> (11) *the unfairness of the debtor's use of the bankruptcy process.*

*McDow,* 295 B.R. at 79-81 (citing *Industrial Insurance Services, Inc. v. Zick (In re Zick),* 931

F.2d 1124, 1126-27 (6th Cir. 1991), *In re Griffieth,* 209 B.R. 823 (N.D.N.Y. 1996), *In Re

Spagnolia,* 199 B.R. 362, 365 (Bankr. W.D. Ky. 1995), and *In re Hammonds*, 139 B.R. 535, 541

(Bankr. D. Col. 1992)).

     The D.C. Court of Appeals has found that an involuntary petition was filed in bad faith

when it as filed "for the sole purpose of thwarting [Borrower's] rights to have its claims litigated

in the D.C. Superior Court."  *See, e.g., Wisconsin Ave. Assocs., Inc. v. 2720 Wisconsin Ave.

Coop.*, 441 A.2d 956, 962 (D.C. 1982); *see also Corto v. National Scenery Studios,* 705 A.2d

615, 620 (D.C. 1997) ("The filing of successive bankruptcy petitions [by the debtor's family

members] with the clear intent of forestalling the legal proceeding constitutes bad faith.").

## G.   LEGAL  ARGUMENT

Parties Cannot Collude to Create Federal Jurisdiction.

The longstanding principle that parties cannot manufacture federal jurisdiction over civil

actions is codified in the U.S. Code.  Under 28 U.S.C. § 1359, federal courts do not have

jurisdiction over civil actions "in which any party, by assignment or otherwise, has been

improperly or collusively made or joined to invoke the jurisdiction of such court."  28 U.S.C. §

1359 (italic emphasis added).  In *Kramer v. Caribbean Mills, Inc.,* 394 U.S. 823 (1969), the U.S.

Supreme Court outlined the history and purpose of this statute prohibiting collusion to create

federal jurisdiction.  In *Kramer,* a contract between a Haitian company and a Panamanian

company was assigned to a Texas attorney to create federal jurisdiction.  The *Kramer* court noted

that:

> If federal jurisdiction could be created by assignments of this kind, which are easy
> to arrange and involve few disadvantages for the assignor, then a vast quantity of
> ordinary contract and tort litigation could be channeled into the federal courts at
> the will of one of the parties.  Such "manufacture of Federal jurisdiction" was the
> very thing which Congress intended to prevent when it enacted § 1359 and its
> predecessors.

*Kramer,* 394 U.S. at 828-829 (italic emphasis added); *see also U.S.I. Props. Corp. v. M.D.*

*Constr. Co.,* 860 F.2d 1, 6 (1st Cir. 1988) ("[P]arties may legitimately try to obtain the

jurisdiction of federal courts, as long as they lawfully qualify under some of the grounds that

allow access to this forum of limited jurisdiction.  On the other hand, using a strawman, *or sham*

*transactions, solely for the creation of otherwise unobtainable jurisdiction, is clearly forbidden*

both by statute and by the policies that underlie diversity jurisdiction.") (italic emphasis added).

31

Collusion by the WCP Fund, the WCP, Mr. Huertas, and SF NU to channel ordinary contract and tort litigation into a federal court is exactly what is going on here.  They colluded to arrange for some of the Borrowers loan documents, by assignment, to be transferred to JPK NewCo, then created the "insolvency" of JPK NewCo for the express purposes of improperly invoking federal jurisdiction for tactical reasons – to avoid litigating purely state law claims pending in D.C. Superior Court.

<u>There are Numerous Indicators of Bad Faith Here</u>.

JPK NewCo was created, from its inception, with the understanding that there would eventually be a bankruptcy filing, whether voluntary or involuntary.  Here, JPK NewCo's only creditor made a "loan" to JPK NewCo one month prior to the filing of *JPK NewCo I*.  A bankruptcy filing by JPK NewCo was inevitable as the company existed only on paper and had no revenue and no business operations at the time the "loan" was made to it.  In fact, the purported "business operations" of JPK NewCo appear to also have been manufactured.  Part of the "loan" to Mr. Shariri was used to fund a loan by JPK NewCo to Energy Morocco.  This loan appears to have been made in an veiled effort by JPK NewCo to give the appearance of having some business operations.  JPK NewCo then consented to the an involuntary filing on August 6, 2024.  This "friendly" involuntary filing was conveniently manufactured so the Lender Defendants could have an additional basis to argue that there was federal jurisdiction over the claims in the Consolidated Cases.  Mr. VerStandig conceded that bankruptcy for JPK NewCo was contemplated in arguments he has made on behalf of WCP Fund, Mr. Huertas, the WCP, and SF NU in the Removed AP Case.

The Court must "preserve its jurisdictional integrity".  *Little Creek Development*, 779 F.2d at 1072 (internal citations omitted).  Collusive conduct to manufacture federal jurisdiction,

forum shop, and delay pending litigation should not be condoned, but rather should be condemned, by this Court, whose very foundation rests on enforcing equitable principles. *Id.*; s*ee also In re Silberkraus*, 253 B.R. 890, 905 (C.D. Cal. Bankr. Ct. 2000) ("[I]t constitutes bad faith to file bankruptcy to impede, delay, *forum shop,* or obtain a tactical advantage regarding litigation ongoing in a nonbankruptcy forum – whether that nonbankruptcy forum is a state court or a federal district court.") (italic emphasis added); *In re Meltzer*, 516 B.R. 504, 516 (Bankr. N.D. Ill. 2014) ("The filing of an involuntary case shortly before a hearing in related litigation strongly suggests the case was filed only to stall the hearing.").

The WCP Fund, the WCP, SF NU, and Mr. Huertas are all bad actors here.  They transferred loan documents for no consideration with the understanding that JPK NewCo would first use those transfers to as a basis for dismissal, then later file for bankruptcy at some point when it suited their objectives.  The collusion to manufacture federal jurisdiction was orchestrated to frustrate the Borrowers' from pursuing their claims in the Consolidated Cases in the forum of their choice.  To give the protections and benefits of Chapter 11 -- especially the benefits of subchapter V -- to JPK NewCo under these circumstances would be an abuse of the purposes of the Bankruptcy Code.  The underlying purpose of Chapter 11 is to rehabilitate the debtor and offer a fresh start.  JPK NewCo is not a legitimate debtor with a business that needs a fresh start -- it is an alter ego of the WCP Fund, the WCP, Mr. Huertas, and SF NU that was created to try to prevent the Borrowers' claims from being decided in D.C. Superior Court.  There is no legitimate bankruptcy purpose here.  JPK NewCo has no legitimate business operations to reorganize.

<u>The Burden Has Shifted to JPK NewCo.</u>

Because the Borrowers have established a prima facie case that "cause" exists to dismiss this case, the burden shifts to JPK NewCo to demonstrate that "unusual circumstances" exist that

33

establish that dismissing the case is not in the best interests of creditors. *See* 11 U.S.C. §

1112(b)(2).  For the Section 1112(b)(2) exception to apply, the Court must find and specifically

identify unusual circumstances establishing that dismissing the case is not in the best interests of

creditors and the estate. *Id.*  The Borrowers do not believe that any unusual circumstances can

be found here.  This was a collusive bankruptcy case filed to try to gain a tactical advantage and

to try to deny the Borrowers from having their claims adjudicated in D.C. Superior Court.  This

filing was designed to benefit the participants in the scheme and no one else.

      <u>The Court Could Liken The Consolidated Cases to a Two-Party Dispute</u>.

While the Borrowers are separate companies, their claims are nearly identical, with the

sole difference being that 423 Kennedy has a breach of contract claim due to the failure to fund

construction draws.  The claims in the two cases were also consolidated, and the interests of the

Borrowers are aligned.  The Lender Defendants are also all controlled by Mr. Huertas and the

WCP Fund, and their interests, too, are aligned.  Bankruptcy courts are not supposed to be

deciding what are effectively two-party disputes in state court. *In re G–2 Realty Trust*, 6 B.R.

549, 552–53 (Bankr. D. Mass. 1980); *In re Serfass,* 325 B.R. 901, 906 (Bankr. M.D. Fla. 2005)

("Generally, the courts do not condone the use of Chapter 11 to resolve two-party disputes in

the bankruptcy court when such litigation *is still pending* in a non-bankruptcy forum prior to the

commencement of the case.") (italic emphasis added).

## H.  CONCLUSION

JPK NewCo was formed, and filed the instant petition, for improper, bad faith purposes.

There is no valid reason for this case to continue under Chapter 11.  For these reasons, and for

any reasons that may be advanced at the evidentiary hearing to be set on this motion, the

Borrowers respectfully request that this case be dismissed, with prejudice, for cause as being filed in bad faith.

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, P.C.

Dated:  June 23, 2025

/s/ James D. Sadowski
James D. Sadowski, VSB No. 38326
801 17th Street, N.W., Suite 1000
Washington, D.C.  20006
Phone:  (202) 452-1400; Fax: (202) 452-1410
Emails:  jds@gdllaw.com
*Counsel for Creditors Developer RE1, LLC*
*and 423 Kennedy St Holdings, LLC*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of June, 2025, a true copy of the foregoing Motion to Dismiss Chapter 11 Petition Filed in Bad Faith was served electronically and a Notice of Electronic filing should be sent to all persons receiving notices via the Court's CM/ECF system.

/s/ James D. Sadowski
James D. Sadowski

8161\0002\4934-0098-3376.v1